UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF KENTUCKY
PIKEVILLE DIVISION

IN RE

COOK AND SONS MINING, INC.                              CASE NO. 03-70789

DEBTOR


MEMORANDUM OPINION
AND ORDER

James D. Asher seeks approval of a contingency fee in Debtors' Special Counsel James

Asher's Application for Final Allowance of Compensation and Reimbursement of Accrued

Expenses and Contingency Fees and related papers.  [ECF Nos. 1348, 1357, 1359.]  Hearings

were held on August 20 and September 17, 2020.  [ECF Nos. 1355, 1360.]  Asher stated that no

other evidence is forthcoming and asked for a decision on the record.  [ECF No. 1355.]

Asher was retained as special counsel on a contingent fee basis years ago, and he

received payment for the work in 2007.  The case was reopened over a decade later to administer

a contract-based reimbursement of unearned premiums for insurance coverage unrelated to

Asher's special counsel engagement.  There is no support for a contingent fee related to the

current refund of unearned premiums, so the Application is denied.

I.     FACTS.

A.  The Bankruptcy Case.

The Debtors are Cook and Sons Mining, Inc., and Earnest Cook & Sons, Mining, Inc.

They filed voluntary chapter 11 bankruptcy petitions on August 25, 2003.  [Case No. 03-70789,

ECF No. 1; Case No. 03-70790, ECF No. 1.]  The cases were substantively consolidated.  [Case

No. 03-70789, ECF No. 336; Case No. 03-70790, ECF No. 60.]   The Debtors attempted to

1

restructure as an operating entity, but they ultimately ceased operations. The Debtors then

pursued a liquidating plan of reorganization [ECF No. 634], which was confirmed on August 15,

2004 [ECF No. 692].

The Plan created a liquidating entity called the Reorganized Debtor. [ECF No. 634,

Art. 6.] All assets of the Debtors' estates became property of the Reorganized Debtor at

confirmation. [*Id*.] The Plan further established a Post-Confirmation Committee that consisted

of members of the unsecured creditors committee in the bankruptcy case. [*Id.*] The Plan granted

the Post-Confirmation Committee the power to make all decisions for the Reorganized Debtor

and its assets. [*Id.*]

The Post-Confirmation Committee was assisted by a Disbursing Agent, who held the

assets and wrote checks to distribute funds to creditors. [*Id.*] The Disbursing Agent could also

perform other tasks assigned by the Post-Confirmation Committee but had no decision-making

authority. [*Id*.] W. Thomas Bunch was appointed Disbursing Agent. Bunch's law firm, Bunch

& Brock, represented the Debtors and the Reorganized Debtor.

**B.  Asher's 2003 Appointment as Special Counsel.**

On October 30, 2003, the Debtors sought authority to appoint James D. Asher as "Special

Counsel under Code Section 327(e)" on a contingent fee basis ("Employment Application").

[ECF No. 242.]  The Employment Application provided that the Debtors would employ Asher

for the "special and specific purposes" listed. [*Id*.] The relevant work involved insurance related

to the Debtors' preparation plant and related equipment. [*Id*.]

Attached to the Employment Application were two contingency fee agreements executed

by the Debtors and Asher on October 28, 2003 ("Contingency Fee Agreements"). [*Id.*] One

Contingency Fee Agreement addressed damages related to the collapse of a silo based on

insurance coverage provided by Underwriter's at Lloyd's of London ("Lloyds").  The other

Contingency Fee Agreement addressed water damages related to the same insurance coverage.

The Contingency Fee Agreements contemplated compensation based on a percentage of the

recovery for authorized work, if approved by required periodic and final fee applications.  [*Id*.]

Asher was approved as special counsel for the Debtors on November 18, 2003.  [ECF

No. 285.]  The terms of the Order were consistent with the Employment Application and

Contingency Fee Agreements.

### C.  The Letcher Circuit Court Litigation and Settlement.

Asher filed an action styled *Earnest Cook and Sons Mining, Inc. v. Underwriters at*

*Lloyd's, London, and CS&W Insurance Services, Inc*., Case No. 04-CI-165, in the Letcher

Circuit Court on April 29, 2004.  [ECF No. 1348-2 at ¶ 4.]  The Debtor Earnest Cook & Sons

Mining, Inc.[1] alleged in the initial Complaint that it asked CS&W Insurance Services, Inc., its

insurance broker ("CS&W Insurance"), to procure an insurance policy covering the coal

preparation plant and related property for the period September 22, 2002, to September 22, 2003.

[*Id.*, Exh. C at ¶ 6.]  The property insurance was a condition to a mortgage loan secured by the

coal preparation plant and related property.  [*Id.*, Exh. C at ¶ 9.]

According to allegations in the Complaint, CS&W Insurance told the Debtor that Policy

No. GEP 5005 issued by Lloyds was in place.  [*Id.*, Exh. C at ¶ 6.]  The Complaint argued that

Policy No. GEP 5005 ("Lloyds Policy") provided coverage:

> to and for [the Debtor] against, in particular but not limited to, loss or damage to
> its property and/or equipment, both above and below ground equipment,
> incidental structures and contents, specifically including the plaintiff's coal
> preparation plant, building and contents, and further insurance the plaintiff for
> debris removal expenses and loss to others, including but not limited to, raw coal;

---

[1] A reference to Debtor related to the state court litigation refers to the plaintiff.

that said policy provided coverage for the preparation plant of $5,000,000 and for contents of $100,000.

[*Id.*]

The Debtor's raw coal silo blew out and collapsed in early 2003 and coverage under the Lloyds Policy was denied.  [*Id.*, Exh. C at ¶¶ 7, 8.]  The Debtor argued coverage was denied because CS&W Insurance was negligent and breached its duty when placing the insurance.  [*Id.*, Exh. C at ¶ 9.]

Asher filed a First Amended Complaint on July 17, 2006.  [ECF No. 1348-2, Exh. D.] The First Amended Complaint added claims against another party involved in placing the insurance, Casualty & Surety, Inc. ("Casualty").  [*Id.*, Exh D. at ¶ 2.]  The First Amended Complaint also added earlier insurance periods and alleged CS&W Insurance was responsible for the failure to refund unearned premiums caused "by listing the same pieces of equipment on more than one schedule."  [*Id*, Exh. D at ¶ 8.]

Asher filed a Second Amended Complaint on December 4, 2006, that named two more defendants, James Allen and Crawford and Company ("Crawford").  [ECF No. 1348-2, Exh. E at 1.]  The Second Amended Complaint claimed that Allen and Crawford performed a negligent inspection of the coal preparation plant that ultimately contributed to the silo damage and denial of coverage under the Lloyds Policy.  [*Id.*, Exh. E at 2-4.]  The Second Amended Complaint also alleged that Lloyds, CS&W Insurance, Casualty, and Crawford knew Allen was not qualified to perform the inspection.  [*Id.*]

On January 19, 2007, the Letcher Circuit Court decided the Debtor's silo was covered by the Lloyds Policy.  [ECF No. 1348-2 at ¶ 9.]  The state court defendants appealed the decision.  [*Id.* at ¶ 10.]  On August 7, 2007, the Kentucky Court of Appeals entered an order granting the Debtor's motion to dismiss the appeal and remanded the matter for further proceedings.  [*Id.*

at ¶ 11.]  The matter settled in November 2007 for payments of $1,250,000.00 from Lloyds,

$1,000.00 from Lexington Insurance Co., and $11,500.00 from CS&W Insurance.  [ECF

No. 1294.]  Asher received $451,134.77 for his contingent fee and expenses on

December 24, 2007.  [*Id.*]

  **D.  The Discovery of the AIG Reimbursed Premiums.**

  The Post-Confirmation Committee filed the Final Report in Chapter 11 Proceeding a few

months later on May 16, 2008 [ECF No. 1308], and moved to close the case [ECF No. 1310].

The motion was granted [ECF No. 1311], and the bankruptcy case was closed on June 9, 2008

[ECF No. 1313].  A final decree discharging the Post-Confirmation Committee was entered on

June 11, 2008.  [ECF No. 1313.]

  Over a decade later, Matthew B. Bunch, a lawyer with Bunch & Brock, moved to reopen

the case.  [ECF No. 1315.]  A representative of AIG Insurance contacted Bunch & Brock

because the insurance company was holding "Return Premiums of approximately $367,472" that

it would not turn over without a court order ("AIG Reimbursed Premiums").  [*Id*. at ¶ 4.]  The

case was reopened on September 24, 2018, to issue the order and allow the Court to administer

the AIG Reimbursed Premiums.  [ECF No. 1318.]

  The AIG Reimbursed Premiums arose from insurance policies issued by American

International Group, aka AIG Global Energy, d/b/a National Union Fire Insurance Company of

Pittsburg, PA ("AIG/National Union").  [*See* ECF Nos. 252, 1331.]  The AIG Reimbursed

Premiums are made up of the following:

| Contract # | Policy Period | Premium Earned Refund / (Due) | Commission Refund / (Due) | Reimb. Premium Refund / (Due) |
|---|---|---|---|---|
| 968400 | 09/25/00-09/25/01 | $49,106 | $6,744 | $42,362 |
| 968402 | 09/25/02-09/25/03 | ($377,472) | ($24,006) | ($353,466) |
| 968403 | 09/25/03-04/12/04 | $771,224 | $92,650 | $678,574 |
| | | | | **$367,470** |

[ECF No. 1331-1.]

AIG/National Union provided workers compensation, automobile, and general liability insurance coverage.  [ECF No. 252.]  The majority of the AIG Reimbursed Premiums arise from the 2003-04 period, which only lasted six months because the Debtors' cases became administratively insolvent.  The workers compensation coverage accounted for the vast majority of the premiums paid and recovered.  For example, the premium reimbursement for workers compensation coverage in 2003-04 was 83% of the $771,224.00 gross refund.  [*Id.*]

CS&W Insurance placed the insurance coverage for the first two policy years, but it was replaced by South West Insurance Agency ("South West") for the final 2003-04 period.  [*See* ECF No. 122.]  South West did not have a part in the Lloyds insurance coverage and was not a target of the Letcher Circuit Court litigation.

**E.  Asher's Fee Application.**

Despite receiving payment for the work he was hired to do, Asher now seeks to recover one-third of the AIG Reimbursed Premiums, $146,988.73, based on his contingent fee arrangement.  [ECF No. 1348.]  Asher supports his request with (i) his own affidavits; (ii) an affidavit from his legal assistant, Misty Slone; and (iii) an affidavit from W. Thomas Bunch, II, a member of Bunch & Brock during the bankruptcy case and now.  [ECF Nos. 1348-1, 1348-2, 1348-3, 1359-1.]  Asher also submitted deposition transcripts from the Letcher Circuit Court litigation.  [ECF Nos. 1357-1, 1357-2, 1357-3.]

Asher destroyed any other relevant files in anticipation of his retirement in 2013.  [ECF No. 1348-2 at ¶ 18.]  The information provided attempts to explain the circumstances surrounding the Contingency Fee Agreements, Asher's appointment as special counsel, the

subsequent state court litigation and settlement, and Asher's investigation into premium refunds and adjustments.

**II.      Jurisdiction and Administration of the Estate.**

The Bankruptcy Court has jurisdiction to decide whether Asher is entitled to fees from the AIG Reimbursed Premiums.  The Plan recognized the continuing jurisdiction of the Bankruptcy Court to determine all claims and act as necessary to carry out the Plan.  [ECF No. 634, Art. 7.2.]  This is consistent with the jurisdiction granted by 28 U.S.C. § 1334.  Further, this is a core proceeding under 28 U.S.C. §§ 157(b)(2)(A), (B), and (O).  Venue is proper pursuant to 28 U.S.C. § 1409.

The Plan provided that all assets of the Debtors were transferred to the Reorganized Debtor and held by the Disbursing Agent.  [ECF No. 634, Art. 6.]  So the Reorganized Debtor, operating for the benefit of the creditors, is the only entity that may claim ownership of the AIG Reimbursed Premiums.  [*Id.*; *see also* ECF No. 1331.]  As such, the Court has an obligation to exercise jurisdiction to administer the asset.  *See, e.g., Scharmer v. Carrollton Mfg. Co.*, 525 F.2d 95, 98–99 (6th Cir. 1975) (when new assets are discovered, the case is reopened to administer the assets).

W. Thomas Bunch had retired, so Matthew B. Bunch offered, and was appointed, to act as the Disbursing Agent to administer the AIG Reimbursed Premiums.  [ECF Nos. 1315, 1318.] But the Plan provides that the Disbursing Agent may only act under the authority of the Post-Confirmation Committee, which was disbanded in 2008.  Therefore, the Bankruptcy Court must approve any distribution of the AIG Reimbursed Premiums.  *See Scharmer supra*;  *see also In re Kieffer*, 306 B.R. 197, 206 (Bankr. N.D. Ohio 2004) (the bankruptcy court has an independent duty to review a request for compensation).

7

## III.    Discussion.

Asher argues he was retained to pursue insurance claims, so he is entitled to a contingent

fee on the AIG Reimbursed Premiums.  [ECF No. 1348.]  This argument is not supported by the

engagement papers in the record or Kentucky law requiring strict interpretation of contingent fee

agreements.  Further, even if the engagement papers had some arguable relationship to recovery

of the AIG Reimbursed Premiums, Asher is not entitled to payment under the applicable

provisions of the Bankruptcy Code.  His work had nothing to do with a contract-based recovery

that occurred more than a decade after his special counsel relationship with the Debtors ended.

### A.  Asher Was Not Hired or Approved to Pursue Unearned Premiums from AIG/National Union.

Asher argues that the scope of his employment included pursuit of unearned premiums

from AIG/National Union.  The Employment Application and related engagement papers do not

support Asher's broad interpretation of the scope of his employment.  Asher was only employed

to pursue insurance coverage and related damages from Lloyds and the parties that placed the

insurance, including CS&W Insurance.

#### 1.  The Engagement Papers Do Not Contemplate Employment Related to the AIG/National Union Insurance Coverage.

The Debtors sought to employ Asher for a specific special purpose under 11 U.S.C.

§ 327(e).  [ECF No. 242.]  Section 327(e) allows retention of an attorney who has represented

the debtor "for a specified special purpose … if in the best interest of the estate."  11 U.S.C.

§ 327(e).  The Employment Application has equivalent language, indicating that Asher was

retained "for the following special and specific purposes."  [ECF No. 242.]  The identified

special purposes include an unrelated collection action and:

> Legal services rendered in the prosecution and collection of claims and/or causes
> of action **against only the following entities** with compensation to be paid to

Asher on a contingency fee basis according to the terms and conditions set forth in the attached agreements, subject to Court approval thereto, regarding the filing of :

  (i)  Underwriters Lloyd's at London regarding the collapse of the Debtors' silo and the damages resulting therefrom; and

(ii)  C S & W Insurance Services, Inc., National Casualty Company, Casualty & Surety, Inc. American Safety Risk Retention Group, Inc., James Godfrey or any other related party thereto regarding water damage claim.

[*Id*. (emphasis supplied).]

The description of the special and specific purposes is restrictive; it is not broad and open to expansive interpretation.  The listed purposes only apply to the entities described. AIG/National Union is not listed and there is no way to make a connection because the insurance coverage is unrelated.

### a.  A Lawyer Retained Under § 327(e) Is Only Entitled to Compensation for Work Related to the Specified Special Purpose.

A court does not consider whether an attorney retained for a specified special purpose under § 327(e) is disinterested, so a specific description of the required work is mandatory.  *In re Licking River Mining, LLC*, 562 B.R. 351, 355 (Bankr. E.D. Ky. 2016); *see also In re Polaroid Corp.*, 424 B.R. 446, 452 (Bankr. Minn. 2010) (the § 327(e) lawyer "is truly more of a 'hired gun'" retained only for the job in the retention papers); *In re Running Horse, L.L.C.,* 371 B.R. 446, 451 (Bankr. E.D. Cal. 2007) (the court must determine that the scope of work is limited to a special purpose); *In re Fretter, Inc.*, 219 B.R. 769, 779 (Bankr. N.D. Ohio 1998) (the plain language of § 327(e) contemplates employment on one specific matter).  The lawyer must seek court approval if the work goes beyond the specified special purpose.  *See In re Brierwood Manor, Inc.*, 239 B.R. 709, 717-18 (Bankr. D. N.J. 1999) (chapter 11 counsel assisting chapter 7 trustee after conversion needed court approval pursuant to § 327(e)).

The Employment Application limits the work "only" to the entities listed.  "Only" means, "[w]ithout anyone or anything else."[3]  THE AMERICAN HERITAGE DICTIONARY OF ENGLISH LANGUAGE 1265 (3d ed. 1992).  "Attorneys who render services beyond the specified scope of their retention risk denial of compensation for such unauthorized services."  COLLIER ON BANKRUPTCY ¶ 327.04[9][c] (Richard Levin & Henry J. Sommer eds., 16th ed.); *see also In re Licking River Mining, LLC*, Case No. 14-10201, 2015 WL 5601284, at *13 (Bankr. E.D. Ky. September 22, 2015) (counsel assumes the risk of reduced compensation for unnecessary services); *Brierwood Manor*, 239 B.R. at 717 (compensation is not allowed for work outside the scope of employment "irrespective of the benefit to that Trustee or the estate"); *In re Imperial Corp. of America*, 181 B.R. 501, 506-07 (Bankr. S.D. Cal. 1995) (no compensation is allowed for general services or if the lawyer was conflicted).

Asher's employment as special counsel was approved based on the information provided by the Debtors that is in the Employment Application or otherwise in the record.  Asher was only retained to deal with the Lloyds Policy and any related coverage issues.  It is improper to extrapolate beyond the specified special purpose in the record.  *See In re Polaroid Corp.*, 424 B.R. at 452 (special counsel is limited to the job specified in the retention papers); *In re Air South Airlines, Inc*., Case No. C/A No. 97-07229-W, 1998 WL 34020727, at *6 (Bankr. D. S.C. 1998) (approval under § 327(e) limits the scope of employment).

---

[3] Case law almost uniformly finds that "only" means just that:  "only".  *See, e.g., Util. Workers Union of Am., Local 118 v. Ohio Edison Co*., 172 F.3d 51 (6th Cir. 1998) (recognizing that the word "only" indicates a limitation in a contract provision); *Cont'l Ins. Co. of City of New York v. Fortner*, 25 F.2d 398, 400 (6th Cir. 1928) (finding that an insurance policy stating that a building was to be occupied "'only for dwelling purposes' intended to exclude use of the building for general business purposes."); *Caston Sch. Corp. v. Phillips*, 689 N.E.2d 1294, 1298 (Ind. Ct. App. 1998) (recognizing that the word "only" used in a statute operated as a "limiting word"); *Indiana Rd. Mach. Co. v. Lebanon Carriage & Implement Co*., 78 S.W. 861, 862 (Ky. 1904) (finding that a contract limited the applicability of a certain provision by using the word "only"); *Wilkinson v. Rosser's Ex'r*, 104 S.W. 1019, 1021 (Ky. 1907) (finding that the word "only" used in a codicil limited a bequest).

### b.  The Lloyds Policy and AIG/National Union Insurance Coverage Are Unrelated.

The Lloyds Policy insured the preparation plant and related equipment.  *See supra* at Part I.C.  The AIG/National Union policies provided business-related coverage, including workers compensation, automobile, and general liability insurance.  *See supra* at Part I.D.  The AIG/National Union policies were in place for several years and were part of a risk management program described in the Debtors' Motion for Order Authorizing the Assumption of Certain Insurance Contracts with AIG filed on November 3, 2003 ("Motion to Assume").  [ECF No. 252.]

The Motion to Assume explained that the Debtors received multi-level discounts for purchasing the package of insurance products that did not include anything related to the Lloyds Policy or the property making up the preparation plant.  [*Id.*]  There is no correlation between the Lloyds Policy and the workers compensation, automobile, and general liability insurance coverage provided by AIG/National Union.

### c.  Asher's Certified Declaration Confirms His Understanding of the Limited Engagement.

The Declaration of Proposed Attorney required by Federal Rule of Bankruptcy Procedure 2014 attached to the Employment Application is similarly restrictive.  [ECF No. 242, Exh. 3.] The Declaration is Asher's notarized statement, under penalty of perjury, that he was not disqualified from representing the Debtor.  The Declaration confirms Asher understood he was only retained to pursue state court litigation related to the Lloyds insurance policy for the silo and water damage and CS&W Insurance and others involved with placing the coverage (and the unrelated collection action).  [*Id.*, Exh. 3 at ¶ 5.]

> **2. The Contingency Fee Agreements Do Not Contemplate Employment Related to the AIG/National Union Insurance Coverage.**
>
> > **a. The Contingency Fee Agreements Do Not Address the AIG/National Union Insurance Coverage.**

The first Contingency Fee Agreement attached to the Employment Application relates to the silo damages and the second addresses water damages.  [ECF No. 242.]  The record and Asher do not explain whether the Debtors ever pursued the water damage claim, but the Contingency Fee Agreements are substantially the same and neither supports a claim to the AIG Reimbursed Premiums.

Section One of the first Contingency Fee Agreement, titled Statement and Subject of Employment, provided:

> Clients hereby retain and employs [sic] Attorney to represent Clients *for Underwriters Lloyd's at London regarding the collapse of a silo and damages resulting therefrom* and pursuit of, all applicable insurance proceeds, if any, and any and all other causes of action that Attorney deems necessary (referred to as "Claim"). Clients now empower Attorney to file such legal action(s) as may be advisable in Attorney's judgment, and Clients agree to fully cooperate with Attorney in pursuit of this Claim or cause of action.

[*Id*. (emphasis supplied).]

Section One of the second Contingency Fee Agreement is consistent, but the italicized portion is "against CS&W Insurance Services, National Casualty Company, Casualty & Surety Inc., American Safety Risk Retention Group, Inc., James Godfrey and any other party thereto regarding water damage claim(s) and damages resulting therefrom …"   [*Id.*]

Section Two of the Contingency Fee Agreements sets out certain percentages of recovery based on the stage of the proceeding when resolution occurs.  [*Id*.]  Asher was entitled to 33.33% of the recovery if resolved before or after the case was scheduled for trial.  [*Id*.]  This is the percentage Asher recovered from the Lloyds settlement and the amount requested by the Employment Application.

Nothing in the Contingency Fee Agreements even hints at work related to AIG/National Union or the recovery of unearned premiums from that insurance coverage. If Asher was entitled to a percentage recovery of unearned premiums related to insurance other than the Lloyds Policy, *i.e.*, the AIG/National Union coverage, then this information was required in the Contingency Fee Agreements.

### b.  Contingency Fee Agreements Are Strictly Construed.

The Contingency Fee Agreements do not grant Asher authority to represent the Debtors regarding any insurance coverage. The plain language limits recovery to silo and water damages covered by the Lloyds Policy and claims against the parties that placed that coverage. Agreements providing for payment of contingency fees for Kentucky attorneys are strictly construed.

A contingency fee agreement is a contract. *In re Sulzer Hip Prosthesis and Knee Prosthesis Liability Litig.*, 290 F. Supp. 2d 840, 848 (N.D. Ohio 2003) ("The contingency fee agreement … is, of course, a contract, and questions regarding the interpretation and enforcement of contingency fee contracts are normally questions of state law."). Interpretation of a contract is a question of state law. *Davis v. Siemens Med. Solutions USA, Inc*., 399 F. Supp. 2d 785, 792 (W.D. Ky. 2005).

Kentucky courts will enforce a contract "strictly according to its terms and will assign those terms their ordinary meaning" absent ambiguity. *Id.* (citing *Frear v. P.T.A. Indus., Inc*., 103 S.W.3d 99, 106 (Ky. 2003)). A contractual term is ambiguous if it is "reasonably susceptible to different or inconsistent interpretations." *Id.* Any ambiguity in the language of a contingency fee contract is construed strictly against the attorney and in favor of the client. *Weinberg v. Gharai*, 338 S.W.3d 307, 313 (Ky. Ct. App. 2011); *see also Alioto v. Hoiles*, 531 F.

App'x 842, 849 (10th Cir. 2013) ("If any ambiguity exists, the construction favoring the client

controls.")

Asher points to some phrases in the Contingency Fee Agreements to suggest they

expanded his representation beyond the specified special purpose listed.  The obligation to

strictly construe contingency fee agreements does not allow this latitude.  Further, the language

is not ambiguous when read in context.

Section One of the Contingency Fee Agreements refers to "all applicable insurance

proceeds".  [ECF No. 242.]  The "applicable" insurance proceeds are specifically described.

[*Id*.]  Applicable is defined as having "reference to" a particular object or idea or "fit or suitable

for its purpose."  OXFORD ENGLISH DICTIONARY (3d Ed. 2008). "Applicable" is an adjective that

is only understood by the object or idea that it references.  "Applicable insurance proceeds" are

those applicable to "the collapse of a silo and damages resulting therefrom" and "water damage

claim(s) and damages resulting therefrom."

A similar analysis controls the phrase that follows in Section One:  "and any and all other

causes of action that Attorney deems necessary."  Like the applicable insurance proceeds, "any

and all other causes of action" relates back to the recovery for damages to the silo or water

damage at the beginning of the sentence in Section One.  Further, the general authority to pursue

necessary causes of action is part of the entire sentence; it is not an open-ended invitation to sue

any person for any offense.

Asher also points to Sections Four and Ten to suggest his representation had few or no

limits.  Section Four grants Asher an attorney's lien on the "Claim or cause of action."  [ECF No.

242.]  Section Ten addresses the Clients' fraud if they try to settle in a manner that excludes

Asher.  [*Id*.]  Both Section Four and Section Ten are common terms in contingency fee

14

agreements that protect the attorney, but only as to the specified special purpose of the representation - *i.e.*, the "Claim" defined in Section One of the Contingency Fee Agreements.

The Debtors and Asher drafted the Contingency Fee Agreements with specificity by setting out the particular defendants and claims that he was retained to pursue. No part of the Contingency Fee Agreements expands the scope of Asher's duties beyond the specified special purpose.

### B. Asher is Not Entitled to Fees Under 11 U.S.C. § 328 or § 330.

The preceding discussion confirms the engagement papers did not retain Asher to recover unearned premiums. Asher was engaged to pursue a different insurance carrier that provided unrelated insurance coverage and the parties that procured that coverage. Further, even if Asher is given the benefit of the doubt, he has not satisfied his burden to justify a right to payment under the applicable provisions of the Bankruptcy Code. *In re Sharp*, 367 B.R. 582, 585 (Bankr. E.D. Mich. 2007).

### 1. Professionals Are Entitled to Reasonable Compensation for Work Performed.

There is no set method of compensation for a debtor's attorney employed under 11 U.S.C. § 327. Most professionals involved in a bankruptcy case are compensated on an hourly fee basis, which is reviewed for reasonableness according to 11 U.S.C. § 330. The Sixth Circuit uses the lodestar method to assess the reasonableness of fees in bankruptcy cases subject to § 330. *Boddy v. U.S. Bankr. Ct. (In re Boddy)*, 950 F.2d 334, 337 (6th Cir. 1991). Under this method, "the court will arrive at an attorney's fee by first determining the 'lodestar' amount, which is calculated by 'multiplying the attorney's reasonable hourly rate by the number of hours reasonably expended.'" *Id.* (quoting *Grant v. George Schumann Tire & Battery Co.*, 908 F.2d 874, 879 (11th Cir. 1990)).

Other arrangements for compensation are also permitted.  Section 328(a) allows retention

under § 327 "on any reasonable terms and conditions of employment, including on a retainer, on

an hourly basis, or on a contingent fee basis."  11 U.S.C. § 328(a).  The benefit of approval under

§ 328(a) is the avoidance of uncertainty through pre-approval of the "representation and fee

arrangement prior to performing the contemplated services." *Nischwitz v. Miskovic (In re*

*Airspect Air, Inc.)*, 385 F.3d 915, 920-21 (6th Cir. 2004) (quoting *In re Barron*, 325 F.3d 690,

693 (5th Cir. 2003) (internal quotation marks omitted)).

The Employment Application and Contingency Fee Agreements address state court

litigation for tort and contract claims.  Tort litigation is an appropriate service paid through a

contingent fee arrangement.  *See Gaskill v. Gordon*, 160 F.3d 361, 363 (7th Cir. 1998).  The

same is true for the contract-based portion of the dispute.

Asher suggested during oral argument that his contingent fee arrangement was pre-

approved pursuant to § 328(a) and there is no room for review of his entitlement to the requested

fee.  The Order approving the Employment Application might have approved the contingency

fee arrangement for the silo and water damage claims, but anything else was still subject to

review.  Further, Asher's request for a contingency fee does not withstand scrutiny under any

section of the Bankruptcy Code.  So Asher is not entitled to a fee even if his alleged services

were part of his approved representation.

**2.  The Engagement Papers Contemplate a Review of the Fees for
      Reasonableness.**

Whether a fee application is analyzed under § 328 or the reasonableness standard of

§ 330 is determined by considering the "totality of the circumstances, looking at both the

application and the bankruptcy court's order." *Nischwitz*, 385 F.3d at 922.  Factors to consider

include "whether the debtor's Application for appointment specifically requested fee pre-

16

approval, whether the court's order assessed the reasonableness of the fee, and whether either the

order or the Application expressly invoked § 328." *Id.* The totality of the circumstances require

a reasonableness review under § 330; the fees were not pre-approved under § 328.

Initially, a review of the Employment Application and Order show only a mere mention

of § 328, but no express invocation of § 328(a). [*See* ECF Nos. 242, 285.] Also, the

Employment Application requires Court approval of a request for fees "no more often than every

120 days as provided in Section 327, 328 and 331 of the United States Bankruptcy Code…"

[ECF No. 242.] The Order contains similar language. [ECF No. 285.] The Employment

Application and Order also directed Asher to apply for final compensation at the conclusion of

the proceedings. [ECF Nos. 242, 285.] Periodic fee applications are a part of a review for

reasonableness, not a pre-approved contingent fee arrangement.

More significant for the AIG Reimbursed Premiums, any pre-approval of fees would only

have applied to the clearly described work on which the contingency fee is based. The

Employment Application and Contingency Fee Agreements do not address recovery of unearned

premiums from AIG/National Union. Instead, the Employment Application and Contingency

Fee Agreements address contract and tort litigation related to losses covered by, and failure to

pay under, the unrelated Lloyds insurance coverage. *See supra* at Part III.A and Part III.B.1.

These limitations weigh heavily against a conclusion that any contingent fee was pre-

approved. "Under the Code, approval of compensation for 'actual, necessary services rendered'

under § 330, rather than pre-approval under § 328, forms the default rule." *Nischwitz*, 385 F.3d

at 921. Based on this analysis, a § 330(a) lodestar review is the best way to determine any

reasonable compensation due to Asher.

Asher suggested that the Plan obviated the need for Court approval because the Post-Confirmation Committee could approve his fees. [ECF No. 1348.]  That argument might justify the unapproved payment of Asher's fees related to the 2007 settlement, but it cannot work now. There is no Post-Confirmation Committee to sign off on the fees, so this Court has an obligation to review the Fee Application. *See In re Kieffer*, 306 B.R. at 206 (the bankruptcy court must approve a fee application even if there are no objections).

### 3.   The Fee Application Fails a Review for Reasonableness.

A lodestar review requires fees that are:  "(1) reasonable; (2) incurred for services that were *actually* rendered; and (3) incurred for services that were *necessary*."  *In re Allied Computer Repair, Inc.*, 202 B.R. 877, 883 (Bankr. W.D. Ky. 1996) (emphasis in original). Relevant factors addressing reasonable compensation include:

(A)   the time spent on such services;

(B)   the rates charged for such services;

(C)   whether the services were necessary to the administration of, or beneficial at the time at which the service was rendered toward completion of, a case under this title;

(D)   whether the services were performed within a reasonable amount of time commensurate with the complexity, importance, and nature of the problem, issue, or task addressed;

(E)   with respect to a professional person, whether the person is board certified or otherwise has demonstrated skill and experience in the bankruptcy field; and

(F)   whether the compensation is reasonable based on the customary compensation charged by comparably skilled practitioners in cases other than cases under this title.

11 U.S.C. §§ 330(a)(3)(A)-(F).

### a.   Asher Has Not Proven His Work Generated the AIG Reimbursed Premiums.

Asher points to his alleged communication with CS&W Insurance to suggest his work ultimately resulted in delivery of the AIG Reimbursed Premiums.  This argument is flawed for several reasons.  Asher never argues in his Fee Application that his communications addressed

18

the AIG/National Union coverage, and the deposition questions only address the Lloyds

coverage.  [ECF Nos. 1348, 1357, 1359.]  The lack of any physical proof evidencing a claim for

recovery of unearned premiums from AIG/National Union makes it very hard to believe Asher's

alleged demands went beyond the Lloyds Policy.  *See Kieffer*, 306 B.R. at 206 (Asher has the

burden of proof).

The leap is also hard to make because communicating only with CS&W Insurance was

not enough.  CS&W Insurance was a defendant in the Letcher Circuit Court litigation.  It is not

reasonable to conclude a plaintiff's counsel would trust the defendant-broker to assume a

demand made during litigation addressed an unnamed carrier for unrelated insurance coverage.

Further, CS&W Insurance was not even the broker for the AIG/National Insurance

coverage for the final period that resulted in the largest part of the reimbursement.  CS&W

Insurance was terminated as the Debtors' broker for the 2003-04 AIG/National Union program

year.  [ECF No. 122 (providing notice of "the change of agents … from CS&W Insurance

Services, Inc. to South West Insurance Agency, Inc.").]  South West, the last active insurance

broker for the AIG/National Union coverage and a non-party to the state court litigation, was the

logical target of a letter seeking recovery of the AIG Reimbursed Premiums.  [*See id.*]

Also, the alleged bases for recovery of unearned premiums from each carrier is different.

The Complaint against Lloyds was amended to allege that CS&W Insurance was responsible for

the failure to refund unearned premiums "by listing the same pieces of equipment on more than

one schedule."  [ECF No. 1348-2, Exh. D at ¶ 8.]  This claim involves either fraud or negligence

related to scheduling the equipment covered by the Lloyds Policy, the only defendant-insurer.

The AIG Reimbursed Premiums were recovered because the premiums for workers

compensation, automobile, and general liability insurance were based on estimates.  [*See* ECF

Nos. 252, 1331.]  The agreement with AIG/National Union contemplated a regular audit within

fifteen months of the inception of the policy.  [*See* ECF No. 252, Exh. B at § V.]  Although very

late, the AIG Reimbursed Premiums stem from a contract term and not the allegations against, or

demands to, CS&W Insurance.

Asher is not the source of the AIG Reimbursed Premiums.  A mathematical computation

required by the AIG/National Union contract is unrelated to any demand for premiums related to

duplicate listings on equipment schedules for the Lloyds Policy.  *See Bell County Bd. Of Educ. v.*

*Lee*, 39 S.W.2d 492, 494 (Ky. 1931) (a contingency fee is not due on voluntary payments).

### b.  The Amount Claimed Is Unreasonable.

Asher was allowed an hourly rate for unrelated work in the Employment Application at

$175.00.  [ECF No. 242.]  Using this reasonable rate, Asher must show 857 hours of work to

justify a $150,000.00 fee.

Asher did not submit time records.  The only evidence of work to recover unearned

premiums comes from the meager allegations regarding file review and communications with

CS&W Insurance from Asher's self-serving affidavits and deposition transcripts.  [ECF Nos.

1348, 1357, 1359.]  There is no way to infer that he spent over 850 hours attempting to collect

unearned premiums from AIG/National Union even accepting his affirmations as true.

The record shows Asher's work related to recovery of damages for the collapse of the

silo and water damage under the Lloyds Policy.  Asher received over $450,000.00 from the

settlement based on the Contingency Fee Agreements and the bankruptcy case was closed.  Not

only did Asher fail to prove he was retained to recover unearned premiums on a contingent fee

basis, but any work he did do could never justify a $150,000.00 fee.  *See supra* at Part III.A; *see*

*also Crestwood Farm Bloodstock v. Everest Stables, Inc.*, 751 F.3d 434, 446-47 (6th Cir. 2014)

(the bankruptcy court may use its discretion to impose a global reduction).

4.  **A Review of the Employment Application Pursuant to § 328(a) Does Not Justify Payment of a Contingent Fee.**

A bankruptcy a court may adjust a fee previously approved under § 328(a):

[T]he court may allow compensation different from the compensation provided under such terms and conditions after the conclusion of such employment, if such terms and conditions prove to have been improvident in light of developments not capable of being anticipated at the time of the fixing of such terms and conditions.

11 U.S.C. § 328(a).  This case presents extraordinary and unusual circumstances that justify a

departure from any pre-approved compensation.  *See In re Smart World Technologies, LLC*, 552

F.3d 228, 234-35 (2d Cir. 2009).

The extraordinary and unusual circumstances are described throughout this Opinion.

Asher was only engaged to pursue damage claims related to coverage under the Lloyds Policy

that was sourced by a terminated insurance broker.  Contingency fee agreements are strictly

construed, and the contracts in this case did not address the AIG Reimbursed Premiums.  Even

assuming Asher tried to pursue unearned premiums from AIG/National Union, the legal work

was extremely limited and directed at parties that would not likely have passed on the request to

AIG/National Union.  The time difference between any alleged work and the payment of the

AIG Reimbursed Premiums hammers home this conclusion.

IV.    **CONCLUSION.**

For the foregoing reasons, it is ORDERED that the Debtors' Special Counsel James

Asher's Application for Final Allowance of Compensation and Reimbursement of Accrued

Expenses and Contingency Fees [ECF No. 1348] is DENIED.

---

**The affixing of this Court's electronic seal below is proof this document has been signed by the Judge and electronically entered by the Clerk in the official record of this case.**



Signed By:
*Gregory R. Schaaf*
**Bankruptcy Judge**
**Dated: Monday, October 19, 2020**
(grs)